UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEREMIAH L. GLOWACKI,

     Plaintiff,

                                 Case No. 1:21-cv-868

v.

                                 Hon. Hala Y. Jarbou

O'REILLY AUTO ENTERPRISES, LLC,

     Defendant.

_____/

## **OPINION**

Plaintiff Jeremiah L. Glowacki is a former employee of Defendant O'Reilly Auto Enterprises, LLC.  He alleges that O'Reilly terminated him in retaliation for reporting sexual harassment, violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2701.  Before the Court is O'Reilly's motion for summary judgment (ECF No. 22).  For the reasons herein, the Court will deny the motion.

## I. BACKGROUND

The following is a summary of the evidence, viewing the facts in a light most favorable to Glowacki.

### A. Glowacki's Role at O'Reilly

Glowacki worked for O'Reilly from 2011 to 2020.  (*See* Glowacki Dep. 7, ECF No. 26-1.) He began working for the company as a Store Manager and was promoted to District Manager in 2017.  (*Id.* at 15.)  As District Manager, he reported to a Regional Manager and a Regional Field Sales Manager ("RFSM").  (*Id.* at 35.)  Tony Kaupp was his RFSM.  (*Id.* at 33.)  His most recent Regional Manager was Dave Rudolph.  (*Id.* at 17.)

### B. O'Reilly's Harassment Policies

O'Reilly maintains a policy prohibiting sexual harassment, discrimination, and retaliation in the workplace.  (Policy, ECF No. 22-2, PageID.82.)  The policy requires those who "feel [they have] been subjected to unwelcome harassment or discrimination by a member of management, another team member, or a non-employee . . . to report the situation as soon as possible."  (*Id.*)  An employee must "report their allegations verbally or in writing directly to his/her supervisor or another member of management, division human resources specialist/manager, or Team Member Relations[.]"  (*Id.*, PageID.83.)

O'Reilly provides training to its managers regarding sexual harassment.  Its training presentation informs managers that they are to "treat all harassment or discrimination allegations seriously and confidentially."  (O'Reilly Presentation, ECF No. 22-4, PageID.90-91.)  Managers are obligated to report the allegations, even if the "team member" making the allegations asks the manager not to take any action.  (*Id.*, PageID.91.)  Glowacki last attended a harassment training presentation in May 2019.  (Training Log, ECF No. 22-3, PageID.85.)

### C. Bowdich Tells Glowacki About Harassment by Her District Manager (2018)

In early 2018, Glowacki made an online connection with Danielle Bowdich, a Store Manager in Utah.  They developed a personal relationship, and he visited her in April later that year.  (Glowacki Dep. 46-47.)  Because they worked in difference states and he did not supervise her, share direct reports with her, or report to the same supervisor, O'Reilly's policies did not prohibit their personal relationship.  (Glowacki Decl. ¶ 6, ECF No. 26-2.)  During Glowacki's visit to Utah, Bowdich told him that her District Manager, Jeff Gooch, would do "weird things," such as "drop roses on her car and leave" or bring soup to her when she was sick.  (Glowacki Dep. 48.)  She was "pretty vague" about the details and told him she was "going to take care of it."  (*Id.* at 47.)

### D. Glowacki Observes Harassment of Bowdich by Gooch (2019)

Glowacki regularly attended O'Reilly's annual leadership conference with other managers from around the country, including Bowdich.  At the conference in January 2019, while Glowacki and Bowdich were sitting together, Gooch texted Bowdich "crazy stuff" suggesting that he was "mad at her"; he was apparently jealous about Glowacki.  (*Id.* at 49.)  She showed the texts to Glowacki.  (*Id.*)  She also told Glowacki that Gooch had tried to kiss her.  (*Id.* at 51.)  Later, Glowacki saw Gooch caressing Bowdich's hair and putting his hands on her shoulders.  (*Id.* at 50.)  Glowacki spotted Kaupp and immediately reported Gooch's behavior.  (*Id.* at 49.)  Dave Short, a Store Manager, was present as well.  (*Id.* at 43.)  Both Kaupp and Short had seen Gooch's conduct.  (*Id.*)  Kaupp told Glowacki "not to do anything about it."  (*Id.* at 49.)

### E. Bowdich Tells Glowacki About More Harassment by Gooch (2020)

Glowacki and Bowdich did not speak to one another very often for the rest of the year.  He communicated with her again at the leadership conference in January 2020.  On January 24, 2020, he texted her to see how she was doing.  She responded that Gooch was "back to his shenanigans last night."  (*Id.* at 61.)  She told him that he had "grabbed another team member's ass" and then tried to hug Bowdich.  (*Id.* at 61-62.)

### F. Glowacki Reports Gooch's Harassment of Bowdich to O'Reilly

After receiving Bowdich's texts, Glowacki immediately went to Joey Kraska, a human resources representative for O'Reilly, and reported Gooch's behavior.  (*Id.* at 62.)  Kraska determined that Wayne Robinson was the human resources manager responsible for Bowdich's division.  (Kraska Dep. 28, ECF No. 26-6.)  Glowacki and Kraska then went to find Robinson.  After they did so, Glowacki gave Robinson a written statement about Gooch's behavior toward Bowdich.  (*Id.* at 29; *see* 1/24/2020 Glowacki Statement, ECF No. 26-7.)

According to Glowacki's statement, Bowdich told him in 2018 that Gooch had been "sexually harassing her." (1/24/2020 Glowacki Statement, PageID.761.) Gooch had put roses on her car, brought soup to her home, and then "confessed his love to her" in front of other employees at the leadership conference in January 2018. (*Id.*) At the 2019 conference, Gooch "got very mad" and "was acting jealous." (*Id.*) He sent Bowdich text messages saying "that he was mad [be]cause [Glowacki] was there." (*Id.*) After she confronted Gooch about it, Glowacki saw him rubbing her shoulders and "caressing" her hair. (*Id.*) Finally, during the 2020 conference, Bowdich told Glowacki that Gooch had harassed her again in front of other employees.

In addition to the written statement, Glowacki told Robinson that others were aware of Gooch's behavior. Bowdich had told Glowacki that "her entire team in Utah already knew about [Gooch's] behavior." (Glowacki Decl. ¶ 12.) And at the 2019 conference, other managers saw Gooch's harassing behavior, including Kaupp. (*Id.* ¶ 13.) Glowacki reported these details to Robinson. (*Id.*)

### G. O'Reilly Investigates Gooch's Report and Terminates Gooch

O'Reilly investigated Glowacki's allegations. According to O'Reilly's investigation records, Robinson spoke with Bowdich. She reportedly told Robinson that Gooch had pursued a romantic relationship with her for several years and she rebuffed him. (O'Reilly Compl. Rep., ECF No. 26-8, PageID.764.) The pursuit involved "unwanted personal contact" and "inappropriate and unprofessional electronic messages, phone calls, and in-person communication." (*Id.*) He also sent her "inappropriate photos and unwanted gifts[.]" (*Id.*) Finally, at the 2020 conference, he "acted unprofessional towards her and others at the hotel bar"; "his behavior included unwanted touching and unprofessional statements." (*Id.*)

Robinson's investigation confirmed that other employees had witnessed or were aware of Gooch's harassing behavior toward Bowdich. For instance, Emmalee Malone, a Store Manager,

reported that Bowdich had complained to her in March 2019 that Gooch "was trying to have a relationship with her and wouldn't stop asking her about it."  (Malone Statement, ECF No. 26-9, PageID.839.)  A few months later, Bowdich told Malone that Gooch "was still bothering her and that it was getting worse."  (*Id.*)  He had sent her a nude picture of himself and told her that "he couldn't work with her so she would not be able to advance in [her] district."  (*Id.*)

Similarly, Kristin Beard, another manager, said that at a prior conference, she saw Gooch put his arm around Bowdich and another employee and tell them that he was "going to take them upstairs."  (Beard Statement, ECF No. 26-9, PageID.840.)  That conduct made Beard "uncomfortable."  (*Id.*, PageID.840.)  She compared it to a more recent incident at the 2020 conference in which Gooch sat down next to Beard, put his arm around her, and squeezed her leg. (*Id.*)

Neil Armstrong, a Store Manager, reported that he noticed "some uncomfortability between" Gooch and Bowdich at the 2018 conference and that "it was obvious something happened."  (Armstrong Statement, ECF No. 26-9, PageID.820.)  At the 2019 conference, Bowdich asked Armstrong to walk her to her room because "something had happened the year before" involving Gooch.  Bowdich said Gooch had told her that his feelings for her "caused a problem in his decision to be [Regional Manager] and who to make . . . [District Manager]."  (*Id.*)

Courtney Hawthorn, a Store Manager, saw Gooch make inappropriate sexual remarks in front of several female employees at the 2020 conference.  (Hawthorn Statement, ECF No. 26-9, PageID.797.)  He also touched Hawthorn inappropriately.  (*Id.*)  Bowdich subsequently told Hawthorn that Bowdich "had a history with [Gooch] harrasing [sic] her in the past," which Hawthorn "had heard."  (*Id.*, PageID.798.)

Kevin Eggett, a District Manager, saw Gooch put his arm around Beard and Bowdich on different occasions during the 2020 conference.  (Eggett Statement, ECF No. 36-9, PageID.829.)

Michael Conner, a Store Manager, saw Gooch put his hands on Bowdich's shoulders during the 2020 conference.  (Conner Statement, ECF No. 26-9, PageID.823.)  Gooch then put his head on the side of her face, and she attempted to pull away from him.  (*Id.*, PageID.824.)  Another employee tried to intervene by pulling Gooch way from Bowdich.  (*Id.*)  Shortly after that incident, a different employee told Conner that Gooch had grabbed her butt.  (*Id.*)  Later, yet another employee reported to Conner that Gooch had rubbed her calf.  (*Id.*)

Alisha Medina, a Store Manager, saw Gooch grab Bowdich's arms at the 2020 conference and tell her "she is safe," which Medina thought was "weird."  (Medina Statement, ECF No. 26-9, PageID.804.)  Medina also reported that Gooch "hit [Medina] on the butt" during the conference.  (*Id.*, PageID.805.)  Later, Medina saw Gooch try to talk to Bowdich, but Bowdich repeatedly told him to stop.  (*Id.*, PageID.806.)

That same day, Medina told Steve Kartchner, a District Manager, that Gooch had grabbed her butt.  (Kartchner Statement, ECF No. 26-9, PageID.816.)  Kartchner spoke to Gooch about it but apparently did not report Gooch's conduct until the investigation.  (*Id.*)

At the same conference, an employee told Darleny Fuentes, a Store Manager, that Gooch had grabbed her leg, making her feel awkward.  (Fuentes Statement, ECF No. 26-9, PageID.846.)

Bowdich herself reported that her District Manager had asked Gooch to "stop" after Gooch touched her "upper thigh multiple times" and whispered "I love you" in her ear at the 2020 conference.  (Bowdich Statement, ECF No. 26-19, PageID.917.)

Following Robinson's investigation, O'Reilly terminated Gooch on January 30, 2020.  (*See* O'Reilly Compl. Rep., PageID.764.)

### H. O'Reilly Investigates a Complaint About Glowacki

The same day that Glowacki reported Gooch's harassment, Rudolph told Kraska that he had received a complaint from District Manager Joshua Winkfine that Glowacki was allegedly in a sexual relationship with an employee under Glowacki's supervision. (Kraska Dep. 37-38.) After the conference, Kraska investigated this complaint by speaking with Winkfine. (*Id.* at 42-43.) Winkfine reported that Glowacki had said something implying that he was in a sexual relationship with a female employee in his district. Kraska had Winkfine prepare a written statement about these allegations. Winkfine told Kraska to speak with O'Reilly employee Will Anderson for more information.

Kraska contacted Anderson. Anderson reported that Glowacki had shown him a nude photograph of a female O'Reilly employee and identified that employee as someone who worked in Glowacki's district in Niles, Michigan. (*Id.* at 50, 60.)

Kraska then traveled to Niles to interview the employee identified by Anderson. At the interview, the employee denied being in a romantic or physical relationship with Glowacki or any another O'Reilly employee, signing a statement to that effect. (*Id.* at 56; Employee Statement, ECF No. 26-12.) Kraska had no reason to doubt her assertions. (*Id.* at 58.)

Kraska and Rudolph met with Glowacki on January 30, 2020, to question him about the alleged nude photograph and his alleged relationship with the employee in Niles. (*Id.* at 62.) Glowacki denied these allegations, verbally and in a signed statement. (*Id.* at 68-69; 1/30/2020 Glowacki Statement No. 2,[1] ECF No. 26-14.)

---

[1] The Court refers to this statement as "Statement No. 2" because Glowacki signed it shortly after "Statement No. 1," cited below.

Kraska and Rudolph also discussed Glowacki's report about Gooch's harassment of Bowdich. Glowacki told them that he had known about the harassment of Bowdich for several years, but he did not report it because she asked him not to. (Kraska Dep. 60.) In another signed statement, Glowacki described his relationship with Bowdich and her disclosures of Gooch's harassment. According to this statement, she told him in 2018 that Gooch would "harass" her. (1/30/2020 Glowacki Statement No. 1, ECF No. 26-13, PageID.856.) For instance, Gooch "confessed his love to her" at the 2018 conference, in front of other employees. (*Id.*) He would also leave flowers on her car and show up at her apartment with soup. (*Id.*) Bowdich showed Glowacki a message in which Gooch said that he could never promote her to District Manager while he was a Regional Manager because it would force him to get a divorce. (*Id.*) Glowacki also described his observations of Gooch's harassing behavior at the 2019 and 2020 conferences. (*Id.*)

### I. O'Reilly Terminates Glowacki

Rudolph purportedly made the decision to terminate Glowacki shortly after their meeting. (Rudolph Dep. 24, 80, ECF No. 26-3; Kraska Dep. 84-85.) He consulted with Kraska and another member of O'Reilly's human resources department before reaching his decision. (*Id.* at 24-25, 81.) He told Kraska that he wanted to terminate Glowacki because Glowacki "knew about sexual harassment for multiple years without reporting it." (Kraska Dep. 86.) However, O'Reilly's internal records give at least two reasons for terminating Glowacki: (1) he failed to report the harassment of Bowdich after being made aware of it; and (2) he possessed a nude photograph of an O'Reilly employee on his phone. (*See* 1/30/2022 O'Reilly Progressive Discipline Form, ECF No. 26-16, PageID.860.) O'Reilly now contends that it could not substantiate the allegations that Glowacki possessed a nude photograph of an O'Reilly employee; it contends that Rudolph decided

to terminate Glowacki solely due to Glowacki's failure to report Bowdich's harassment.  (*See* Def.'s Br. in Supp. of Mot. for Summ. J. 4-5, ECF No. 22.)

Glowacki appealed his termination the following day, asserting that he reported the harassment of Bowdich to Kaupp at the 2019 conference.  (1/31/2020 Glowacki Statement, ECF No. 26-15.)  O'Reilly denied his appeal after Kaupp stated that Glowacki did not tell him about the harassment.  (*See* 2/10/2020 Kaupp Statement, ECF No. 26-18, PageID.890; Kraska Dep. 97; Rudolph Dep. 56-59.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

Glowacki claims that O'Reilly terminated him in retaliation for reporting the sexual harassment of Bowdich.  Title VII makes it unlawful for an employer "to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter[.]"  42 U.S.C. § 2000e-3(a).  Similarly, ELCRA prohibits individuals from

> [r]etaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in a investigation, proceeding, or hearing under this act.

Mich. Comp. Laws § 37.2701(a).

> [P]laintiff must demonstrate four elements to establish a prima facie case of retaliation under  both Title VII and ELCRA: (1) [he] engaged in protected activity, (2) the defendant was aware of the protected activity, (3) "the defendant took an action that was 'materially adverse' to the plaintiff," and (4) there is a causal connection between the plaintiff's protected activity and the defendant's adverse action.

*Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-44 (6th Cir. 2021) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

"[P]laintiff may prove retaliation either through direct evidence or circumstantial evidence." *Id.* at 344.  Because Plaintiff relies upon circumstantial evidence, "[his] claims are evaluated using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.*  Under that framework, if Plaintiff establishes a prima facie case, then the burden shifts to Defendant to produce a "legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas*, 411 U.S. at 802.  "If [D]efendant produces such a reason, the burden shifts back to [P]laintiff to show that the proffered reason was a mere pretext for discrimination." *Jackson*, 999 F.3d at 344.  "The ultimate burden, however, remains with [P]laintiff to convince the factfinder that [D]efendant retaliated against [him] for engaging in protected activity." *Id.*

### A. Prima Facie Case

O'Reilly argues that Glowacki cannot establish the first and fourth prongs of a prima facie case, i.e., protected conduct and causation.

#### 1. Protected Conduct

"Examples of opposition activity protected under Title VII include 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; [and]

refusing to obey an order because the worker thinks it is unlawful under Title VII.'" *Id.* at 344-45 (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)). "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (internal quotation marks and emphasis omitted).

Although Glowacki told O'Reilly about the sexual harassment of Bowdich, which is "virtually always" a form of protected conduct, O'Reilly notes that there are some "limited restrictions on what activity constitutes opposition activity." *Jackson*, 999 F.3d at 345. "The plaintiff . . . must express her opposition in a reasonable manner." *Id.* "For example, '[a]n employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals.'" *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989)). As noted in *Booker*, "'[t]here may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed.  In such a case, his conduct, or form of opposition, is not covered . . . .'" *Booker*, 879 F.2d at 1312 (quoting *Rosser v. Laborers' Int'l Union of N. Am., Local No. 438*, 616 F.2d 221, 223 (5th Cir. 1980)).

Here, O'Reilly contends that Glowacki's conduct was not protected because he did not make a timely report of harassment as required by O'Reilly's policies.  It contends that Glowacki's failure to make a timely report interfered with O'Reilly's legitimate goals of preventing and addressing unlawful harassment.  However, O'Reilly's reliance on *Booker* is misplaced.  O'Reilly improperly focuses on Glowacki's silence rather than his conduct in reporting the sexual

harassment.  The *report* is his protected conduct, not his failure to report.  There is no evidence that the report itself interfered with the performance of Glowacki's duties or rendered him ineffective for his position.  In other words, *Booker* addresses the "form" or expression of an employee's opposition activity, not its timing.  Thus, even if Glowacki delayed in reporting the harassment, the manner in which he made the report was reasonable in that it did not disrupt the work environment or meaningfully interfere with the attainment of O'Reilly's goals.

Next, O'Reilly contends that, to qualify as protected conduct, Glowacki must have opposed "activity that, if true, would be a violation of civil rights laws."  *Comiskey v. Auto. Indus. Action Grp. (A.I.A.G.)*, 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999).  O'Reilly apparently contends that Glowacki's complaint did not fit this criterion because he did not assert that O'Reilly "had previous knowledge" of Gooch's conduct or that O'Reilly had "failed to take action to prevent or correct the conduct."  (Def.'s Br. in Supp. of Mot. for Summ. J. 9.)  For protected conduct, however, Title VII merely requires opposition "in a reasonable manner and with a reasonable and good faith belief" by the plaintiff that the employer's practices violated Title VII.  *Jackson*, 999 F.3d at 346.  In the circumstances here, a jury could conclude that Glowacki had such a belief.  Glowacki reported that Gooch had repeatedly harassed Bowdich.  He also reported that other O'Reilly employees had witnessed some of Gooch's conduct and that the harassment continued for several years.  O'Reilly provides no support for its contention that a report of sexual harassment is protected conduct only if the report expressly states that the employer was already aware of the harassment and failed to act.  The principle in *Comiskey* excluded opposition to employer conduct that was clearly not a violation of Title VII, i.e., a complaint that the employer "unfairly accused" the employee of "contributing to a sexually hostile atmosphere[.]"  *Comiskey*, 40 F. Supp. 2d at 898.  An employer's unfair accusation of that sort would not be a violation of Title VII.  *Id.*  In

contrast, there is no question that Glowacki's complaint concerned sexual harassment, which can be a violation of Title VII.

Finally, O'Reilly argues that Glowacki did not engage in protected conduct because he merely conveyed a complaint of harassment that occurred to another employee.  O'Reilly relies on *Sawicki v. American Plastic Toys, Inc.*, 180 F. Supp. 2d 910 (E.D. Mich. 2001), in which the plaintiff's subordinates presented her with a written complaint of harassment toward them by a shift supervisor.  *Id.* at 913.  The plaintiff created a typed version of the complaint that the subordinates signed and then the plaintiff delivered that complaint to management.  *Id.*  The court concluded that the plaintiff's "mere delivery" of her subordinates' complaint to management was not protected conduct because it was not evidence of the plaintiff's personal opposition to the misconduct.  *Id.* at 918.

*Sawicki* is distinguishable.  Unlike the plaintiff in *Sawicki*, Glowacki personally reported the details of the harassment of another employee.  He did not merely deliver a document signed by another individual.  To the extent O'Reilly argues that reporting harassment is not protected conduct when the reporter is not the victim of the harassment, its argument is not supported.  Title VII contains no such limitation on opposition activity.  *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (holding that an employee statement about harassment towards a fellow employee "is covered by the opposition clause").  Even the court in *Sawicki* acknowledged that the plaintiff would have engaged in protected conduct if she had personally reported the sexual harassment of her subordinates to management.  *See id.* ("Such opposition could have taken the form of a verbal complaint *by the plaintiff* to management[.]") (emphasis in original).  That is what Glowacki did here.  Accordingly, O'Reilly's arguments that Glowacki did not engage in protected conduct are not persuasive.

### 2. Causation

Next, O'Reilly argues that Glowacki cannot establish a causal connection between his report of harassment and his termination, and that the temporal proximity between his report and the termination are not sufficient to establish such a connection. However, O'Reilly terminated Glowacki only six days after he reported the harassment. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Ziedler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *accord Kirkland v. City of Maryville*, 54 F.4th 901, 912 (6th Cir. 2022); *cf. Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (less than three weeks between protected conduct and adverse action was sufficient to show causal connection). Thus, the short time period between Glowacki's report and O'Reilly's decision to terminate him is sufficient to show a causal connection.

O'Reilly also argues that Glowacki cannot show causation because he "admitted" that there was no causal connection between his report and his termination. After his termination, he sent an email to O'Reilly's human resources personnel stating that he believed O'Reilly had terminated him due to his plan to exercise his stock options. (2/5/2020 Glowacki Email, ECF No. 22-13, PageID.467.) He did not mention retaliation as a reason for the termination. But that statement was not an admission by Glowacki; it was simply speculation about why O'Reilly would have acted as it did. As Glowacki explained in his deposition, he made this statement before seeing his employment records. (Glowacki Dep. 80.) He was not in a position to make admissions about the motivation for O'Reilly's conduct. In short, Glowacki has provided sufficient evidence of causation to establish a prima facie case of retaliation.

## B. Pretext

O'Reilly asserts a legitimate, non-retaliatory reason for its termination decision.  It contends that Glowacki did not comply with its company policy for reporting allegations of sexual harassment.  According to O'Reilly, Glowacki was aware of Gooch's ongoing harassment of Bowdich as early as 2018 but did not report it until almost two years later.  Accordingly, the burden shifts to Glowacki to prove that O'Reilly's stated reason was a pretext for retaliation.  O'Reilly argues that Glowacki cannot meet this burden.

To show pretext, Glowacki must demonstrate "both (1) that [Defendant's] proffered reason for [firing him] [was] not its actual reason[] for doing so and (2) that unlawful retaliation was the actual reason." *Kirkland*, 54 F.4th at 911.  He can meet this burden by demonstrating "that the proffered reason (1) has no basis in fact, (2) did not actually motivate [D]efendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007).

### 1. Basis in Fact

As evidence of pretext, Glowacki asserts that he complied with O'Reilly's policy by reporting the sexual harassment to Kaupp in 2019.  In other words, O'Reilly's proffered reason is not based in fact.  The parties dispute whether Kaupp was Glowacki's "supervisor" for purposes of complying with the reporting requirement in O'Reilly's company policy.  Glowacki contends that both Kaupp and a Regional Manager (Glowacki Dep. 35) supervised him, whereas O'Reilly asserts that Glowacki's sole supervisor was the Regional Manager.  Kaupp himself testified that he was not Glowacki's supervisor.  (Kaupp Dep. 15.)  However, Glowacki notes that Kaupp's job title was *Regional* Field Sales Manager, whereas Glowacki was a District Manager.  The term "regional" in O'Reilly's employee hierarchy conveys a higher level of authority than someone at the district level.  Moreover, Kaupp acknowledged that District Managers like Glowacki were

15

required to send him sales reports and that Kaupp would provide coaching and guidance to help the District Managers with profitability in their stores.  (Kaupp Dep. 9-12.)  Further, one role of a RFSM is to ensure that the District Managers "are executing the region manager's vision." (Rudolph Dep. 16.)  If a District Manager "was not doing something they should be doing or wasn't meeting expectations," the RFSM would report that to the Regional Manager.  (*Id.*)  Thus, Kaupp apparently supervised Glowacki in some aspects of Glowacki's job.  This evidence creates a genuine dispute of fact about whether Kaupp was Glowacki's "supervisor" under O'Reilly's policy.

O'Reilly notes that Glowacki did not mention his report to Kaupp until his appeal, after O'Reilly had already terminated him.  However, O'Reilly upheld its decision even after Glowacki raised the issue.

O'Reilly also contends that any statement by Glowacki to Kaupp was not a true report because Glowacki did not reference "putting a stop to Mr. Gooch's behavior; he was simply upset as Ms. Bowdich's friend."  (Def.'s Br. in Supp. of Mot. for Summ. J. 14.)  However, O'Reilly does not explain why Glowacki's motives are relevant to determine whether his report satisfied its reporting policy.

### 2. Changed Reasoning & Treatment of Other Employees

As additional evidence of pretext, Glowacki notes that O'Reilly's justification for its decision has changed.  *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 591-92 (6th Cir. 2002) (explaining that an employer's changing rationale can be evidence of pretext).  According to its own records, O'Reilly first asserted that it was terminating Glowacki due to his failure to report the harassment of Bowdich *and* because of his alleged possession of a nude photograph of an O'Reilly employee and his relationship with that employee.  It now contends that his failure to

16

report the harassment was the basis for its decision; it does not rely on his alleged possession of a nude photograph or relationship with another O'Reilly employee.

O'Reilly asserts that it has "consistently reported its reasons for Plaintiff's termination. [It] has never proffered any other reason for the termination." (Def.'s Reply Br. 6, ECF No. 29.) True, O'Reilly's proffered reason has not changed. It has consistently asserted that Glowacki's failure to report the harassment was grounds for terminating him. This is not a case in which the employer offered one reason for its adverse employment decision and then replaced it with a completely different one. *Cf. Galeta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011). Nor is it a case in which the employer first mentioned its proffered reason *after* it made the adverse employment decision. *Cf. Cicero*, 280 F.3d at 591-92; *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). Instead, this is a case like *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006), in which the employer initially offered the employee several reasons for its decision and then eliminated two of those reasons at the commencement of the lawsuit. *Id.* at 596. Those two reasons turned out to be false. *Id.* There, the court concluded that a change in justification "to include only those [reasons] that were either circumstantially true or could not be as easily penetrated as false" was "suspicious" and was "evidence of pretext." *Id.* The change suggested that the employer "offered any and all reasons he could think of to justify his decision . . . , whether or not they were true." *Id.*

Similarly, Glowacki has provided evidence that O'Reilly initially relied upon multiple reasons for terminating Glowacki and then eliminated at least one of those reasons after commencement of this lawsuit. Its internal records state that O'Reilly decided to terminate Glowacki, in part, because "it has been substantiated through corroborating . . . statements that [Glowacki] had on his phone, a nude photograph of a subordinate Team Member." (Progressive Discipline Form, PageID.860; *see also* O'Reilly Compl. Rep., PageID.851 (asserting that Kraska

17

"consulted with Dave Rudolph [and others] and we all made the decision to terminate" Glowacki based, in part, on "reasonable substantiation of the claims of him being in a relationship with one of his subordinates").)  However, O'Reilly now contends that Rudolph did not rely on Glowacki's alleged possession of a nude photo or his alleged sexual relationship with a subordinate team member to terminate Glowacki because those allegations "could *not* be substantiated." (Def.'s Br. in Supp. of Mot. for Summ. J. 5 (emphasis added).)  Thus, like the defendant in *Asmo*, O'Reilly has apparently eliminated justifications that it knows would not stand up to scrutiny.  This shift in its explanations is somewhat suspicious and provides evidence of pretext.  It calls into question the credibility of O'Reilly's proffered reason.  It also opens the door to an inference that Glowacki's failure to report, standing on its own, would not have been sufficient to terminate Glowacki.

O'Reilly's description of Glowacki's misconduct has also evolved somewhat.  Its personnel records indicate that it decided to terminate Glowacki because he "had been made aware of harassment occurring from a member of management to a store manager, and failed to report it." (Progressive Discipline Form, PageID.860.)  Another record states that Rudolph decided to terminate Glowacki because he had knowledge of harassment "*for years* without reporting it." (O'Reilly Investigation Rep., ECF No. 26-10, PageID.850.)  Rudolph has since testified that he decided to terminate Glowacki because Glowacki "failed to report harassment *for an entire year*." (Rudolph Dep. 80 (emphasis added).)  And now O'Reilly asserts that it terminated Glowacki because he failed to report the harassment "*for nearly two years*." (Def.'s Br. in Supp. of Mot. for Summ. J. 11 (emphasis added).)  These changes are significant because O'Reilly must now explain why it has treated Glowacki differently from other employees.  Its policy requires managers to report harassment as soon as possible, but there is no evidence that any other managers who

witnessed or were aware of Gooch's harassment reported it until O'Reilly's investigation.  There is also no evidence that any of these managers received any form of discipline for these failures. In fact, Kraska could recall only one other instance in which he even investigated an employee for such a failure.  (Kraska Dep. 90.)  That employee's Regional Manager gave the employee a warning.  (*Id.* at 94.)  O'Reilly's apparent decision not to discipline, let alone terminate, any one of the many other managers who failed to report the harassment of Bowdich suggests that Glowacki's failure was not sufficient to warrant termination.  *See Asmo*, 471 F.3d at 595 (noting that a plaintiff can show pretext where the proffered reason "was never used in the past to discharge an employee" (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998))).

Indeed, if the Court accepts Rudolph's explanation in his deposition that Glowacki's failure to report for over a year warranted termination, at least one other manager in Glowacki's division was also aware of Gooch's harassment of Bowdich for a year and never reported it.  Glowacki says that he told Kaupp about the harassment at the leadership conference in January 2019, but Kaupp never reported it.  Glowacki also told Robinson that Kaupp witnessed Gooch's harassing conduct at the 2019 conference.  Similarly, Malone, Beard, and Armstrong told Robinson that they had been aware of Gooch's harassing conduct since 2019.  Yet Glowacki is apparently the only employee who received any discipline for failing to report the harassment of Bowdich in a timely manner.

O'Reilly argues that its different treatment of these other managers does not aid Glowacki's claim because those managers were not similarly situated with Glowacki.  "[I]t is within the company's business judgment to treat differently-situated parties differently.  Without similarly situated parties, [the Court] cannot adjudge the intent of the employer as to retaliation."  *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 503 (6th Cir. 2009).  "'[T]he plaintiff and the employee with

whom the plaintiff seeks to compare himself must be similar in all of the relevant aspects' in order for the two to be similarly-situated." *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  "In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Id.* (citing *Ercegovich*, 154 F.3d at 352).

To distinguish the other managers, O'Reilly focuses on the individuals who made the decisions that led to Glowacki's termination.  It notes that Kraska is the one who brought the complaint against Glowacki for his failure to report the harassment.  He was not involved in Robinson's investigation of Gooch's conduct or in Robinson's interviews with other employees about that conduct because it was not Kraska's responsibility to investigate the conduct of employees outside his division.  (Kraska Dep. 84.)  In fact, Kraska did not receive a copy of the statement that Glowacki submitted to Robinson.  (*Id.* at 83.)  Thus, he would not have been aware of what other managers, including Malone, Beard, and Armstrong, reported to Robinson about their knowledge of Gooch's behavior prior to 2020.  The same is true of Rudolph, Glowacki's supervisor.  There is no evidence that he knew about the conduct of other managers in failing to report Gooch's harassment and was responsible for their discipline.

Furthermore, the managers mentioned above who gave statements to Robinson and had knowledge of Gooch's conduct from before 2020 were different from Glowacki because they were Store Managers, not District Managers.  O'Reilly could arguably apply a stricter standard to a higher level of management.  Glowacki also compares himself to Kaupp, but Kraska investigated Kaupp's prior knowledge of Gooch's harassment and Kaupp denied it.  In contrast, Glowacki acknowledged the details of his prior knowledge.

Glowacki is also distinguishable from all the other managers mentioned (except for Bowdich) because there is no evidence that they were aware of the harassment by Gooch for as long a period of time as Glowacki and failed to report it.   In other words, his conduct was apparently more serious than that of any other employee, including Kaupp.  To the extent Glowacki compares himself to Bowdich, he is not similarly situated with her because she was the victim of the harassment.   There are many reasons why an employer could reasonably conclude that a victim of harassment should not be punished for their failure to report it.   Here, for instance, Bowdich's harasser was her supervisor.   Reporting his harassment put her at risk of additional adverse treatment, likely deterring her from making a report.   In addition, an employer could conclude that punishing the victim for failing to report would inflict a double punishment and would deter future reports of harassment.

Glowacki responds that he did not have a duty to report as early as 2018.  He contends that Bowdich's revelations that year were somewhat vague and she apparently did not consider Gooch's texts or physical contact at the time to be "sexual."  (Glowacki Dep. 49-50.)  The record undermines this argument.   In his first statement to O'Reilly, Glowacki himself described Bowdich's allegations in 2018 as "sexual harass[ment]."   (1/24/2020 Glowacki Statement, PageID.761.)  And in another statement to O'Reilly, Glowacki described how Bowdich told him in 2018 that Gooch had confessed his love to her and told her that "he could never promote her to [District Manager] while he was [Regional Manager] [because] he'd get a divorce."  (1/30/2020 Glowacki Statement No. 1, PageID.856.)   The latter are strong indicators of "unwelcome harassment or discrimination by a member of management," triggering the reporting requirement in O'Reilly's policy.  (Policy, PageID.82.)  Behavior does not have to be "sexual" to constitute harassment under that policy.  (*See id.*, PageID.81-82.)

21

Nevertheless, on the whole, the Court concludes that Glowacki has presented sufficient evidence of pretext to create a genuine dispute of fact about whether O'Reilly terminated him in retaliation for his protected conduct.  As discussed above, O'Reilly's evolving reasons for its decision are somewhat suspicious and undermine the credibility of its proffered reason.  In addition, despite the differences between Glowacki and the other managers, O'Reilly's apparent decision not to take any disciplinary action against any other employee for not reporting Gooch's conduct lends some credence to Glowacki's claim that O'Reilly improperly targeted him for his protected conduct.  In summary, viewing the evidence in a light most favorable to Glowacki, a jury could infer that O'Reilly's proffered reason was a pretext and that Glowacki's report improperly motivated its decision.

## IV. CONCLUSION

For all the foregoing reasons, the Court will deny O'Reilly's motion for summary judgment.

The Court will enter an order consistent with this Opinion.

Dated: January 5, 2023                              /s/ Hala Y. Jarbou
                                                    HALA Y. JARBOU
                                                    CHIEF UNITED STATES DISTRICT JUDGE