UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERAMIAH L. GLOWACKI,

      Plaintiff,

                               Case No. 1:21-cv-868

v.

                               Hon. Hala Y. Jarbou

O'REILLY AUTO ENTERPRISES, LLC,

      Defendant.

_____/

## **OPINION**

Plaintiff Jeramiah L. Glowacki worked for Defendant O'Reilly Auto Enterprises, LLC, from 2011 to 2020, attaining the position of District Manager. Six days after he reported that Regional Manager Jeffrey Gooch had been sexually harassing a subordinate, O'Reilly terminated Glowacki. Glowacki then brought this action against O'Reilly, claiming that it had retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2701. After a trial, the jury found in favor of Glowacki, awarding him over $2 million in damages. Before the Court is O'Reilly's renewed motion for judgment as a matter of law, for a new trial, or in the alternative, to alter or amend the judgment (ECF No. 75). Also before the Court is Glowacki's motion for attorney's fees, costs, and interest (ECF No. 67). For the reasons herein, the Court will grant both motions in part and deny them in part.

## **I. BACKGROUND**

The Court summarized the facts and evidence of this case in its opinion denying O'Reilly's motion for summary judgment. (1/5/2023 Op., ECF No. 33.) The evidence at trial was

substantially similar to the evidence discussed therein, except that Glowacki also presented the jury with evidence of his damages.

In its verdict, the jury concluded that O'Reilly terminated Glowacki because he reported sexual harassment, in violation of Title VII and the ELCRA.  (Verdict, ECF No. 64.)  The jury also concluded that Glowacki was entitled to punitive damages for O'Reilly's violation of Title VII.  The jury awarded damages as follows: $1 million in punitive damages under Title VII; $979,000 for past economic damages, consisting of $250,000 in lost compensation and $729,000 for lost stock options; $800,000 for future economic damages; and $160,000 for non-economic damages (i.e., emotional distress).  (*Id.*, PageID.1786-1787.)

## II. JUDGMENT AS A MATTER OF LAW

O'Reilly seeks judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure.  The Court grants a renewed motion for judgment under Rule 50(b) "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007)).

### A. Forfeiture

Glowacki argues that O'Reilly forfeited the right to bring a motion under Rule 50(b) because O'Reilly did not move for a directed verdict at the close of the evidence.  To bring a post-verdict motion under Rule 50(b), a party must first bring a motion under Rule 50(a) before the case is submitted to the jury. *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 780-81 (6th Cir. 2020).  Here, O'Reilly moved the Court for a directed verdict and the Court denied its motion.  (3/14/2023 Trial Tr. 172-77, ECF No. 70.)  Glowacki apparently argues that this motion does not count because O'Reilly presented it after the close of Glowacki's proofs rather

2

than after the close of *all* the evidence.  However, Rule 50(a) permits a pre-verdict motion for judgment as a matter of law when "a party has been fully heard on an issue" and there is not sufficient evidence to find in favor of that party.  Fed. R. Civ. P. 50(a)(1).  Rule 50(a) also provides that a party can make a Rule 50(a) motion "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2).  O'Reilly made its motion after Glowacki presented all his evidence.  That was the proper time for its Rule 50(a) motion.  Neither Rule 50(a) nor Rule 50(b) require that a motion for directed verdict be made at the close of *all* the evidence.  *See* 9B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2533 (3d ed.) (noting that "the 2006 amendments to Rule 50(b) removed the requirement that a motion had to be made 'at the close of all the evidence'").  Thus, Glowacki's forfeiture argument is not persuasive.

## B. Improper Admission of Evidence

O'Reilly argues that the Court erred by allowing Glowacki to compare his treatment by O'Reilly to O'Reilly's treatment of other employees who were not "similarly situated" with him. (Def.'s Br. in Supp. of Mot. for J. 7, ECF No. 75.)  Before trial, O'Reilly asked the Court to exclude evidence arising from O'Reilly's investigation of Gooch's harassment.  That investigation revealed that several other managers at O'Reilly were the target of Gooch's sexual harassment while attending O'Reilly's annual leadership conferences.  In addition, other managers attending those conferences witnessed Gooch's harassment but did not report it until O'Reilly's investigation.  None of those managers were disciplined, let alone terminated, for failing to report the harassment they witnessed.  However, O'Reilly notes that two of the individuals involved in the decision to terminate Glowacki, Kraska and Rudolph, were not involved in that investigation

and were apparently unaware of its results.[1]  Thus, O'Reilly argues that the evidence from the investigation was irrelevant.

The Court disagrees.  The stark difference in O'Reilly's treatment of Glowacki, who first brought the harassment to O'Reilly's attention, compared to its treatment of all the other managers at the leadership conferences who failed to report Gooch's widespread harassment, demonstrates how unusual it was for any employee at O'Reilly to receive any form of discipline for failing to comply with O'Reilly's reporting requirements.  Even if Kraska and Rudolph were not aware of the other managers and were not responsible for making disciplinary decisions about their conduct, the unusual nature of their decision to terminate Glowacki (in consultation with O'Reilly's corporate headquarters) made it "more probable" that his protected conduct (i.e., his report of harassment), rather than his policy violation, was the motivating factor for that decision.  *See* Fed. R. Evid. 401; *cf. Asmo v. Keane, Inc.*, 471 F.3d 588, 595 (6th Cir. 2006) ("An employee can show pretext by offering evidence that the employer's proffered reason . . . was never used in the past to discharge an employee." (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998))).

O'Reilly cites several cases, none of which hold that a court erred by allowing similar evidence at trial.  *See, e.g.*, *Griffin v. Finkbeiner*, 689 F.3d 584, 601 (6th Cir. 2012) (court erred by *excluding* evidence of other acts of discrimination by the employer); *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 258 (6th Cir. 2023) (affirming summary judgment decision); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010) (same); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 358 (6th Cir. 1998) (partially affirming summary judgment decision).

---

[1] Rudolph and Kraska were not the only ones involved in the decision.  Glowacki testified that Kraska and Rudolph first called O'Reilly's "corporate" office and then told Glowacki that they had to terminate him because he was "a liability to the company."  (3/14/2023 Trial Tr. 45.)  Similarly, Rudolph testified that he consulted with someone at O'Reilly's corporate headquarters when making the termination decision.  (3/13/2023 Trial Tr. 110-11, ECF No. 69.)  O'Reilly terminated Gooch the same day it terminated Glowacki, after completing its investigation revealing that other managers had been aware of Gooch's conduct.  (*Id.* at 204.)

O'Reilly's reliance on summary judgment case law is misplaced.  O'Reilly focuses on whether other employees were similarly situated with Glowacki when determining whether Glowacki demonstrated that O'Reilly's proffered reason for its decision was a pretext for retaliation.  However, pretext is an element of the *McDonnell Douglas* burden-shifting approach for assessing motive at the summary judgment stage.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  It is not necessarily the focus of the jury's decision at trial.  "Once a discrimination case has proceeded to trial, the core issue before the jury is 'whether it finds by a preponderance of the evidence that the employer intentionally discriminated against the plaintiff,' not whether the plaintiff has made a prima facie case or has shown pretext." *McDole v. City of Saginaw*, 471 F. App'x 464, 475 (6th Cir. 2012) (quoting *Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 597 n.3 (6th Cir. 2003)); *see Kovacevich v. Kent State Univ.*, 224 F.3d 806, 825 (6th Cir. 2000) ("[I]n reviewing the facts of a discrimination claim after there has been a full trial on the merits, a district court or an appellate court must focus on the ultimate question of discrimination rather than on whether a plaintiff made out her prima facie case.").  In short, evidence of O'Reilly's treatment of its other employees was relevant, and that relevance was not substantially outweighed by a risk of unfair prejudice.  The Court is not persuaded that it erred by permitting Glowacki to introduce that evidence at trial.

### C. Sufficiency of the Evidence (Liability)

#### 1. Glowacki's compliance with the reporting requirement.

Next, O'Reilly argues that Glowacki "mislead" the jury by making them believe that he had complied with O'Reilly's reporting policy by reporting the harassment to his Regional Field Sales Manager, Tony Kaupp, instead of a District Manager, Division Human Resources Manager, or a member of corporate Team Member Relations.  (Def.'s Br. in Supp. of Mot. for J. 8.)  Here, O'Reilly is essentially arguing that the jury should have construed the evidence in its favor, which

is not a basis for relief under Rule 50(b).  It was up to the jury to evaluate the evidence and decide whether Glowacki complied with the policy.

More importantly, the jury did not have to find that Glowacki complied with O'Reilly's policy in order to conclude that O'Reilly's termination decision was improper.  The jury could have concluded that Glowacki violated the policy *and also* have concluded that his protected conduct was the motivation for O'Reilly's decision.  In other words, it could have concluded that Glowacki's policy violation was not the actual motivation for O'Reilly's decision.

### 2. O'Reilly's evolving reasons for termination.

O'Reilly argues that Glowacki failed to establish pretext by showing that its reasons for terminating him changed.  O'Reilly argues that its reasons never changed.  As the Court discussed in its summary judgment opinion, however, O'Reilly's internal documents show that it initially relied on several reasons for terminating Glowacki.  According to one of those documents, O'Reilly "substantiated through corroborating . . . statements that [Glowacki] had on his phone, a nude photograph of a subordinate Team Member." (1/5/2023 Op. 17, ECF No. 33.)  O'Reilly later disavowed this particular basis for termination, ostensibly because it did not, in fact, substantiate that Glowacki had possessed a nude photograph of an O'Reilly employee.  Glowacki presented evidence of the foregoing records and of O'Reilly's shifting reasons to the jury.  As the Court stated in its summary judgment opinion,

> [O'Reilly's] shift in its explanations is somewhat suspicious and provides evidence of pretext. It calls into question the credibility of O'Reilly's proffered reason. It also opens the door to an inference that Glowacki's failure to report, standing on its own, would not have been sufficient to terminate Glowacki.

(1/5/2023 Op. 22.)  "[D]isbelief of an employer's proffered reason may play an important role in a Title VII case[.]"  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 721 (6th Cir. 2004).  Here, a jury viewing all the evidence could have reasonably concluded that O'Reilly's proffered reason was

6

not credible and that, under the circumstances, the more likely reason for O'Reilly's decision was Glowacki's protected conduct.

### D. Sufficiency of the Evidence (Damages)

#### 1. Front Pay Damages

The jury awarded Glowacki future economic damages in the amount of $800,000. (Verdict, PageID.1787.)  O'Reilly argues that he is not entitled to such damages as a matter of law. "[I]n Title VII litigation, the goal of a damages award is to put the plaintiff 'as near as may be, in the situation [he] would have occupied if the wrong had not been committed.'" *Denhof v. City of Grand Rapids*, 797 F. App'x 944, 947 (6th Cir. 2019) (quoting *Isabel v. City of Memphis*, 404 F.3d 404, 414 (6th Cir. 2005)).  "Awards of front pay should be evaluated under the standards applied to all Title VII relief: whether the award will aid in ending illegal discrimination and rectifying the harm it causes."  *Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985). "[D]etermination of the propriety of an award of front pay is a matter for the court." *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993); *accord Suggs v. ServiceMaster Ed. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir. 1996).  But "determination of the amount of an award of front pay is a jury question." *Id.*

> O'Reilly cites the following factors as relevant for whether to award front pay:
>
> an employee's duty to mitigate, "the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards."

*Id.* at 399 (quoting *Shore*, 777 F.2d at 1160).

O'Reilly argues that Glowacki is not entitled to any future economic damages because he found some construction work in 2022, after O'Reilly terminated him.  (3/14/2023 Trial Tr. 61-64.)  However, Glowacki's ability to obtain *some* employment does not necessarily rectify the

7

harm caused by O'Reilly. Glowacki testified that he has a GED and that he worked most of his career in the "automotive retail industry." (*Id.* at 17-18.) After his termination, he tried to find work with "local competitors," but they did not want to hire him because he had acquired a "reputation" "in the field." (*Id.* at 56.) In his current position performing construction work, he does not receive the same amount of compensation as he did at O'Reilly. (*Id.* at 68-70.) And he does not receive bonuses, commissions, or healthcare benefits, as he did at O'Reilly. (*Id.* at 69.) He was 44 years old at the time of trial, and he expected to work for another 20 years. (*Id.* at 70.) When calculating future damages, he deducted his current earnings, projected over that 20-year period, from what he expected he would have earned if he still worked for O'Reilly. (*Id.*) The jury awarded him less than his estimate of $922,000 in future damages. (*See id.*)

Considering the factors above, the Court concludes that an award of front pay is warranted. Glowacki provided evidence that he attempted to mitigate future damages and that similar employment opportunities are not available to him. In addition, he tied his estimate to a reasonable work and life expectancy.

### 2. Punitive Damages

O'Reilly argues that the evidence was insufficient for the jury to award punitive damages. There is a three-part test for determining whether punitive damages are available for a violation of Title VII:

> First, a plaintiff must "demonstrate[ ] that the . . . [individuals perpetrating the discrimination acted] with malice or [ ] reckless indifference to[ward] the [plaintiff's] federally protected rights." A plaintiff satisfies this prong by demonstrating that the individual in question acted "in the face of a perceived risk that its actions will violate federal law." Second, the plaintiff demonstrates that the employer is liable by establishing that the discriminatory actor worked in a managerial capacity and acted within the scope of his employment. Third, the defendant may avoid punitive-damages liability by showing that it engaged in good-faith efforts to comply with Title VII.

8

*EEOC v. New Breed Logistics*, 783 F.3d 1057, 1072 (6th Cir. 2015) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534, 539-41, 544-46 (1999)).

O'Reilly argues that there is no evidence that Glowacki's supervisor, Rudolph, acted with malice in terminating Plaintiff; according to O'Reilly, Rudolph acted in good faith by strictly enforcing O'Reilly's "zero tolerance harassment policy," notwithstanding the "obvious risk" that Plaintiff would "falsely portray himself as a heroic whistleblower." (Def.'s Br. in Supp. of Mot. for J. 19.) These arguments effectively challenge the jury's reasonable conclusion that O'Reilly terminated Glowacki in retaliation for his protected conduct. There was sufficient evidence to support that conclusion. Indeed, where full termination occurred within days after Glowacki's harassment report, and where O'Reilly tolerated similar behavior by other managers who did not report Gooch's harassment, a jury could also conclude O'Reilly acted with reckless indifference toward Glowacki's protected rights. *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 515 (6th Cir. 2016) (punitive damages appropriate under "actual malice" requirement of Ohio law where employer "routinely tolerated behavior to support its decision to terminate plaintiff's employment" and employer acted "within weeks" of the harassment report). O'Reilly's reliance on "robust implementation of an organization-wide zero tolerance harassment policy" as evidence of good faith (Def.'s Br. in Supp. of Mot. for J. 19) rings hollow because a jury could conclude that its managers' widespread failure to report or correct the harassment by Gooch, coupled with O'Reilly's decision to not discipline any other manager for violation of the reporting requirement in its harassment policy, "calls into question [its] sincerity to abide by its own policies." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 533 (6th Cir. 2005).

In short, O'Reilly is not entitled to judgment as a matter of law.

### III. NEW TRIAL

O'Reilly seeks a new trial under Rule 59(a), which permits the Court to order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996)). "[I]n finding that a jury's verdict was against the weight of the evidence, the judge must, 'to some extent at least, substitute[ ] his judgment of the facts and the credibility of the witnesses for that of the jury.'" *Id.* (quoting *Miller v. Alldata Corp.*, 14 F. App'x 457, 464 (6th Cir. 2001)).

### A. Great Weight of the Evidence (Liability)

O'Reilly argues that the evidence of liability was against the great weight of the evidence because the Court allowed Glowacki to present evidence of the other managers who were not disciplined. O'Reilly argues that this evidence was irrelevant because the other managers were not similarly situated with Glowacki. Also, O'Reilly argues that there was no evidence that it changed its reasons for terminating Glowacki. These arguments effectively rehash O'Reilly's arguments in Section II. They are not persuasive.

O'Reilly further argues that the Court's refusal to adopt O'Reilly's proposed special instructions resulted in a defective verdict. However, O'Reilly does not articulate why the Court's actual instructions were inadequate.

O'Reilly's first special instruction asked the Court to instruct the jury that, under Title VII, "Plaintiff must establish that he would not have been terminated 'but for' the protected activity."

(Proposed Instructions, ECF No. 75-10, PageID.2583.)  As support for this instruction, O'Reilly cited *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338 (2013), which held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]"  *Id.* at 360.  Instead, this Court instructed the jury that Glowacki had to show that O'Reilly "took the adverse employment action *because of* [Glowacki's] protected activity."  (3/15/2023 Trial Tr. 61, ECF No. 71.)  The latter instruction is consistent with *Nassar*.  *See Varlesi v. Wayne State Univ.*, 643 F. App'x 507, 519 (6th Cir. 2016) (holding that "'because' means 'but for' under *Nassar*").

Moreover, a "because of" instruction was more appropriate here than O'Reilly's "but for" instruction.  O'Reilly's instruction might have led the jury to believe that O'Reilly was liable simply because Glowacki's report set in motion the events that led to his termination.  After all, Glowacki's report drew his supervisors' attention to Gooch's harassment and to Glowacki's prior knowledge of it.  Thus, a jury could conclude that O'Reilly would not have been aware of Glowacki's failure to report harassment from 2018 or 2019 had he not made his report in 2020.  In that sense, "but for" Glowacki's report, O'Reilly would not have terminated him.  But that would not have been the correct standard for liability.  At any rate, O'Reilly accepted the Court's final instruction, effectively waiving its objection.  (3/14/2023 Trial Tr. 208.)

The second and fourth special instructions discussed pretext.  (Proposed Instructions, PageID.2584, 2586.)  The Court rejected these instructions because pretext is not an element of a Title VII retaliation claim.  (3/14/2023 Trial Tr. 211, 220.)  In addition, the Court heeded the Court of Appeals' admonition that "it is normally inappropriate to instruct the jury on the *McDonnell Douglas* analysis[.]"  *Packaging Corp. of Am.*, 338 F.3d at 593.

11

The third special instruction sought to instruct the jury that an employee's conduct is not protected when it "violates legal company rules, disobeys company orders, disrupts the work environment, or willfully interferes with the attainment of the employer's goals."  (Proposed Instructions, PageID.2585.)   This instruction did not apply.   The Court rejected O'Reilly's argument about this issue in its opinion on O'Reilly's motion for summary judgment.   Even if Glowacki did not report the harassment in a timely manner under O'Reilly's policy, his report was protected conduct.

In short, the Court discerns no error in its jury instructions.

**B.   Great Weight of the Evidence (Damages)**

### 1. Back Pay

O'Reilly argues that the jury's award of $250,000 in back pay is contrary to the great weight of the evidence because Glowacki has been able to obtain "comparable employment" performing construction work and other jobs "under the table."  (Def.'s Br. in Supp. of Mot. for J. 22.)  O'Reilly contends that Glowacki's backpay damages should be "capped" at $161,730, which is his "wages from termination until his employment at ODIZ Safety" in September 2022. (Def.'s Br. in Supp. of Mot. for J. 4, 22.)  Also, Glowacki purportedly "mitigated" his damages by restoring and reselling a home in 2021 and by working on another home that he expects to sell for profit.  (*Id.*)

The Court has already explained why Glowacki's construction work at ODIZ was not comparable to his work at O'Reilly; thus, it did not fully mitigate his economic damages.   In addition, a jury could conclude that Glowacki's home restoration income did not mitigate his damages at all because he could have obtained the same income while working at O'Reilly. Glowacki testified that he would have earned the same money selling the restored home while still working for O'Reilly.  (3/14/2023 Trial Tr. 114.)  He bought that home and started working on it

12

before O'Reilly terminated him.  (*Id.* at 100.)  Accordingly, the Court is not persuaded that the jury's back pay award is against the great weight of the evidence.

### 2. Stock Options

The jury awarded Glowacki $729,000 for the value of stock options that he possessed at the time of his termination.  (Verdict, PageID.1787.)  Glowacki testified that he could not exercise these options due to his termination.  He provided the jury with evidence of the value of O'Reilly's stock from the date of his termination up to March 6, 2023, about a week before trial.  (3/14/2023 Trial Tr. 67.)  The jury apparently calculated its award based on the value of O'Reilly stock as of March 6, 2023.  (*See* Verdict, PageID.1787.)  In other words, the jury used the most current data available regarding the value of those stock options.

Relying on *Scully v. US WATS, Inc.*, 238 F.3d 497 (3d Cir. 2001), O'Reilly argues that the appropriate measure of the value of stock options is their value on the date it terminated Glowacki. In *Scully*, the Court of Appeals for the Third Circuit examined the strengths and weaknesses of using the value of stock options at the time of the breach of contract versus a later date when the plaintiff could have exercised those options.  *Id.* at 508-13.  Among other things, using the date of breach (or in this case, the date of termination) provides certainty and takes account of the risk inherent in holding onto options that could decrease in value.  *Id.* at 510-11.  It also avoids the difficult question of when a plaintiff would have exercised those options had the injury not occurred.  And it avoids the hindsight bias that can arise when a stock has increased in value between the date of injury and the date of trial.  On the other hand, using the date of injury potentially rewards the wrongdoer by depriving the plaintiff of the benefit of holding onto stock options until the market price exceeds the exercise price.  In that sense, such a valuation fails to "compensate the plaintiff for all the benefits he lost when denied the option."  *Id.* at 511.

In *Scully*, the Court of Appeals ultimately affirmed the district court's decision to use the value of the lost options as of the date of the breach.  *Id.* at 513.  But the Court of Appeals also noted that "[c]ourts have not taken a consistent approach in computing damages concerning the loss of securities or stock options," and it "doubt[ed] that any single universal damage theory could properly value stock options in all situations."  *Id.* at 511-12.  Thus, *Scully* does not stand for the rule that the date of breach (or in this case, the date of termination) is the only proper date for valuing stock options.  Instead, that court noted different approaches and held that the district court's decision in that particular case was not clearly erroneous.

Similarly, this Court cannot conclude that the jury's decision was incorrect or against the weight of the evidence.  Indeed, Glowacki points to Michigan case law that is potentially more favorable to a plaintiff than the decision by the jury in this case.  In *Stoddard v. Michigan National Bank of Grand Rapids*, 593 N.W.2d 630 (Mich. Ct. App. 1999), the Michigan Court of Appeals noted that, "in Michigan the measure of damages in stock conversion cases is the *highest market value* the stock attains between the date the owner receives notice of the conversion and the expiration of a reasonable period in which to repurchase the stock himself."  *Id.* at 633.

Glowacki also points to a case arising under the Age Discrimination in Employment Act, in which the Court of Appeals for the Third Circuit expressly approved a damages award based on "unrealized stock option appreciation," instead of the value of the plaintiff's options on his termination date, in order to make the plaintiff whole.  *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1244 (10th Cir. 2000).  A similar rationale justifies the jury's decision here.  Accordingly, the Court discerns no error in choosing March 6, 2023, as the appropriate date for valuing Glowacki's stock options, rather than Glowacki's termination date.

14

Next, O'Reilly argues that some of Glowacki's options had expired by March 6, 2023, so those options cannot be the basis for the jury's damages award.  However, O'Reilly identifies no evidence for this assertion, let alone evidence that it submitted to the jury.  Thus, the Court is not persuaded that the jury's award is contrary to the weight of the evidence.

### 3. Front Pay

O'Reilly argues that the jury's award of $800,000 in front pay is against the weight of the evidence because the evidence at trial indicated that Glowacki "has chosen a different career path." (Def.'s Br. in Supp. of Mot. for J. 24.)  As indicated above, however, there was ample evidence for the jury to conclude that O'Reilly's decision had a long-term negative impact on Glowacki's ability to find comparable work.

### 4. Punitive Damages

O'Reilly again asserts that there was no evidence to support a punitive damages award. The Court disagrees, for reasons stated above.

O'Reilly also contends that Glowacki is entitled to no more than $300,000 in punitive damages due to 42 U.S.C. § 1981a(b)(3), which provides that the sum of compensatory and punitive damages awarded under Title VII "shall not exceed . . . $300,000" for an employer with more than 500 employees, like O'Reilly.  42 U.S.C. § 1981a(b)(3)(D).[2]  Progressively smaller limits apply to employers with 201 to 500 employees, 101 to 200 employees, and 15 to 100 employees.  42 U.S.C. § 1981a(b)(3)(A)-(C).

Glowacki responds that the damages cap in §1981a is an affirmative defense.  *See Bell v. O'Reilly Auto Enters., LLC*, No. 1:16-cv-00501-JDL, 2022 WL 782784, at *1 (D. Me. Mar. 15, 2022) (holding that the cap in § 1981a(b)(3) is an affirmative defense, citing *Carrasquillo-Serrano*

---

[2] The ELCRA does not permit punitive damages, so the damages cap for Title VII applies to the punitive damages award here.  *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391, 400 (Mich. 2004).

*v. Mun. of Canovanas*, 991 F.3d 32, 43 (1st Cir. 2021)). O'Reilly never raised this issue until after trial. Consequently, according to Glowacki, O'Reilly waived the right to assert that section as a defense to the jury's verdict.

There is a split in authority on whether statutory limitations on damages are affirmative defenses. *See Carter v. United States*, 333 F.3d 791, 796 (7th Cir. 2003) (citing cases). The Court of Appeals for the First Circuit has concluded that such limitations in various state statutes are affirmative defenses. *See, e.g.*, *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir. 1994) (Massachusetts statute); *Carrasquillo-Serrano*, 991 F.3d at 42 (Puerto Rico statute). Similarly, the Court of Appeals for the Fifth Circuit has held that limitations on liability in general, both contractual and statutory, are affirmative defenses. *See Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.*, 116 F.3d 1095, 1105-06 (5th Cir. 1997) (citing cases). In contrast, the Court of Appeals for the Ninth Circuit has held that a limitation on liability in a California law is *not* an affirmative defense. *See Taylor v. United States*, 821 F.2d 1428, 1433 (9th Cir. 1987).

The argument in favor of treating a statutory limitation on damages as "an avoidance or affirmative defense" under Rule 8(c) of the Federal Rules of Civil Procedure is that it "shares the common characteristic of a bar to the right of recovery even if the general complaint were more or less admitted to." *Jakobsen v. Mass. Port Auth.*, 520 F.2d 810, 813 (1st Cir. 1975). "The argument against treating a cap on damages as an affirmative defense is that it is contingent on the amount of damages sought, which the plaintiff is not required to set forth in his complaint." *Carter*, 333 F.3d at 796.

Some courts have avoided the affirmative-defense question after concluding that there was no prejudice to the plaintiff by the defendant's delay in raising the limitation-of-liability issue after trial. *See, e.g.*, *Carter*, 333 F.3d at 796. That approach corresponds to the principle that the

16

purpose of "requiring the pleading of affirmative defenses is the prevention of unfair surprise." *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987); *see also R.H. Cochran & Assocs., Inc. v. Sheet Metal Workers Int'l Ass'n Loc. Union No. 33*, 335 F. App'x 516, 519 (6th Cir. 2009) ("A defendant does not waive an affirmative defense if the defense is raised at a time when plaintiff's ability to respond is not prejudiced.").

So far as the Court is aware, the Court of Appeals for the Sixth Circuit has not decided whether a statutory limitation on damages is an affirmative defense.

This Court is persuaded that the damages cap in § 1981a(b)(3) is not an affirmative defense. Instead, it is "a Congressional limitation on the court's power to award damages to a Title VII plaintiff." *Oliver v. Cole Gift Ctrs., Inc.*, 85 F. Supp. 2d 109, 111 (D. Conn. 2000).  As such, it cannot be waived.

"The reason why affirmative defenses under Rule 8(c) must be pled in the answer is to give the opposing party notice of the defense and a chance to develop evidence and offer arguments to controvert the defense." *Knapp Shoes*, 15 F.3d at 1226.  But the limitation in § 1981a(b)(3) requires little to no discovery, evidence, or argument to advance or oppose.  Apart from the size of the defendant, which is not disputed here, it leaves nothing for a jury or the Court to decide.

Also, "[n]o plaintiff . . . can complain of unfair surprise, prejudice, or lack of opportunity to respond when confronted with [the limitation in § 1981a] because [that] limitation is part of the same statutory scheme under which the plaintiff has brought his or her claim." *Oliver*, 85 F. Supp. 2d at 111.  "There might be harm in a case such as this if . . . [P]laintiff had some leeway in classifying damages as economic rather than [punitive], or if knowledge that [punitive] damages were [limited] would have induced [him] to devote less effort to proving up such damages and more to proving [his] economic damages." *Carter*, 333 F.3d at 796; *see Ingraham*, 808 F.2d at

1079 (holding that a Texas statute's limitation on damages was an affirmative defense, in part, because the plaintiffs "would have made greater efforts to prove medical damages which were not subject to the statutory limit," had they known the limit applied). But no such harm exists here. Glowacki did not have leeway in classifying damages as economic rather than punitive. The amount of punitive damages was for the jury to decide, after it concluded that such damages were warranted. Glowacki does not contend that he would have focused more time on other damages had he known that punitive damages were subject to a statutory limit. Accordingly, the Court will reduce the punitive damages award from $1 million to $300,000.[3] But there is no basis for granting a new trial.

## IV. AMEND JUDGMENT

O'Reilly also asks the Court to reduce the damages award through Rule 59(e). "A remittitur should be granted only 'if the award *clearly* exceeds 'the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory' for the plaintiff's loss." *Babcock Power, Inc. v. Kapsalis*, 854 F. App'x 1, 5 (6th Cir. 2021) (quoting *In re Lewis*, 845 F.2d 624, 635 (6th Cir. 1988)). "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 443 (6th Cir. 2000)).

---

[3] The jury's compensatory damages awards fall under the ELCRA, so they are not subject to the cap in § 1981a. *See Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007) ("Since [the ELCRA] has no damage caps, the Title VII limits do not apply."). Also, the cap in § 1981a "does not apply to the remedies of front pay and back pay," which are considered equitable rather than compensatory damages. *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 820 (6th Cir. 2016).

Specifically, O'Reilly challenges the jury's awards for back pay and lost stock options. For reasons discussed above, those awards are not clearly excessive and do not shock the judicial conscience of the Court. However, as discussed, the Court will reduce the punitive damages award because it exceeds the $300,000 cap in 42 U.S.C. § 1981a(b)(3).

## V. ATTORNEY'S FEES

Glowacki requests a total of $141,762.50 in attorney's fees, as well as an "attorney fee enhancement" of $11,488.75. (Mot. for Att'y's Fees 1, ECF No. 67.) Title VII permits the Court to award the prevailing party "a reasonable attorney's fee . . . as part of the costs[.]" 42 U.S.C. § 2000e-5(k).

The Court must "begin[ ] by determining 'the fee applicant's lodestar, which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate.'" *Corbin v. Steak 'n Shake, Inc.*, 861 F. App'x 639, 649 (6th Cir. 2021) (quoting *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013)). "The reasonable hourly rate accords with the 'prevailing market rate in the relevant community.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). A reasonable number of hours does not include "excessive, redundant, or otherwise unnecessary" hours. *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

The Court can consider the following factors when determining the reasonableness of the hours and the rate:

> (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

19

*Isabel*, 404 F.3d at 415 (quotation marks omitted).  However, "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate[.]"  *Murphy v. Vaive Wood Prods. Co.*, 802 F. App'x 930, 936 (6th Cir. 2020) (quoting *Hensley*, 461 U.S. at 434 n.9).

"'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"  *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley*, 461 U.S. at 436) (considering an award of attorneys' fees under 42 U.S.C. § 1988 in a civil rights action).  "Where a plaintiff has obtained excellent results, his attorney should recover a full compensatory fee" that normally encompasses "all hours reasonably expended on the litigation[.]"  *Hensley*, 461 U.S. at 435; *accord Isabel v. City of Memphis*, 404 F.3d 404, 415, 416 (6th Cir. 2005) (applying *Hensley* to a Title VII case).

Glowacki's attorney fee request is based on fees for his primary counsel, Brian Farrar, the "second chair" attorney during trial, Gerald D. Wahl, and Raymond J. Sterling, who spent a handful of hours on the case.

### A. General Objections

#### 1. Duplicative Effort

O'Reilly argues that some hours are duplicative because multiple attorneys participated in the same efforts, such as preparing jury instructions and the verdict form.  The Court disagrees.  Sometimes more than one attorney provides input into one document.  The total hours expended is not unreasonable.

#### 2. Excessive Effort

O'Reilly argues that counsel's time reviewing documents and preparing the complaint (13.25 hours), responding to O'Reilly's motion for summary judgment (47.50 hours), and preparing for trial (120 hours) are excessive.  The first two segments of time (for preparing the

complaint and responding to the summary judgment motion) are not unreasonable. It is not clear how O'Reilly calculates 120 hours as the total time for trial preparation. Nonetheless, that time apparently included pre-trial briefing, preparing jury instructions and the verdict form, briefing and a hearing addressing evidentiary issues, preparing witnesses, and coordinating with O'Reilly's counsel regarding trial submissions. That amount of time is reasonable.

### B. Farrar

Glowacki asks for fees for 353.50 hours by Farrar at a rate of $325 per hour. Farrar is an attorney with 14 years of experience located in Oakland County. That experience includes acting as lead trial counsel in approximately 12 federal jury trials. According to the 2023 Economics of Law Survey produced by the State Bar of Michigan,[4] $300 per hour is the median billing rate for attorneys in the Lansing area, $400 per hour is the median for plaintiff's side employment law, and $350 per hour is the median for civil rights litigation. Using those figures, $325 per hour is a reasonable rate. Moreover, 353.50 hours is a reasonable number of hours for pursuing a case from its infancy to its conclusion after a jury trial.

Glowacki also asks for a "fee enhancement" of approximately 10% for Farrar, consisting of an additional $11,488.75, resulting in an overall rate of $357.50 per hour. According to the Supreme Court, there are "rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Purdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010). Those circumstances include the following:

> (1) when the method used to determine the billing rate "does not adequately measure the attorney's true market value"; (2) when the litigation involved "an extraordinary outlay of expenses" and was "exceptionally protracted"; and (3) when there was an "exceptional delay in the payment of fees."

---

[4] *See* https://www.michbar.org/file/pmrc/pdfs/2_2023EOL_SurveyResults.pdf.

*Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 632 (6th Cir. 2020) (quoting *Purdue*, 559 U.S. at 554-56).  There must be "specific evidence" to support an enhancement of the fee award.  *Purdue*, 559 U.S. at 553.

Here, Glowacki provides no evidence to support an enhancement.  Accordingly, the Court will not grant one.

### C. Wahl

Glowacki asks for fees for 64 hours by Wahl at $325 per hour.  Wahl is an attorney located in Oakland County with 47 years of experience.  He has tried over 30 cases before a jury.  Billing records indicate that Wahl consulted with Farrar and assisted with researching and drafting jury instructions, revising trial briefs, and drafting the fee petition.  Wahl also attended the trial and participated in oral arguments regarding jury instructions.  Wahl's hours and rate are reasonable.

O'Reilly argues that Wahl's presence at trial was not necessary because he did not give the opening or closing statement or examine witnesses.  However, it is not unusual for a party to rely on two attorneys during litigation.  Among other things, having two attorneys allows one attorney to work on time-sensitive tasks while the other is occupied.  It also ensures that the trial will continue unimpeded if the first-chair attorney becomes unavailable.  Thus, Wahl's presence was reasonable.

### D. Sterling

Glowacki asks for fees for 13.50 hours by Sterling at $450 per hour.  Sterling is an attorney with 40 years of experience primarily devoted to employment litigation.  He is located in Oakland County.  According to billing records, his role was to provide occasional consulting to Farrar regarding trial strategy, prepare damages charts for trial, and research issues such as jury instructions and damages for stock options.  Considering Sterling's limited role and contribution

to the case, as well as his experience, which is comparable to that of Wahl, the Court will reduce Sterling's rate to $325 per hour.

### E. Summary

In short, the Court will award $140,075.00 in attorney's fees (431 total hours at $325 per hour).

## VI. COSTS

Glowacki seeks costs in the amount of $8,391.61.  28 U.S.C. § 1920 allow Glowacki to recover certain specified costs.  In addition, Mich. Comp. Laws § 37.2802 allows the Court to award "all or a portion of the costs of litigation . . . if the court determines that the award is appropriate."  Mich. Comp. Laws § 37.2802.  Further, under Title VII, 42 U.S.C. § 2000e-5(k), the Court can award "reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services."  *Norcross v. Bd. of Ed. of Memphis City Schs.*, 611 F.2d 624, 639 (6th Cir. 1979) (applying 42 U.S.C. § 1988, which was patterned after § 2000e-5(k)) (overruled on other grounds).  Accordingly, "[r]easonable photocopying, paralegal expenses, and travel and telephone costs are . . . recoverable pursuant to the statutory authority of" Title VII.  *Id.*

O'Reilly objects to $1,158.26 in expenses for hotel accommodations and meals, arguing that these costs are not permitted by § 1920 and are unreasonable given that Glowacki's counsel works in Bloomfield Hills, Michigan, which is about 90 minutes by car to the courthouse in Lansing, Michigan.  As to reasonableness, it is reasonable for counsel to use local lodgings during a trial that is located over an hour from counsel's office.  Accordingly, the lodging and meal expenses are reasonable out-of-pocket costs, compensable under § 2000e-5(k) and Mich. Comp. Laws § 37.2802.  Thus, the Court will allow the total costs of $8,391.61.

23

## VII. INTEREST

### A. Prejudgment Interest

Glowacki asks for prejudgment interest on his damages award under Mich. Comp. Laws

§ 600.6013, which provides in relevant part:

> (1) Interest is allowed on a money judgment recovered in a civil action, as provided in this section.  However, for complaints filed on or after October 1, 1986, *interest is not allowed on future damages* from the date of filing the complaint to the date of entry of the judgment . . . .
>
> * * *
>
> (6) For a complaint filed on or after January 1, 1987, but before July 1, 2002, if the civil action has not resulted in a final, nonappealable judgment as of July 1, 2002, and if a judgment is or has been rendered on a written instrument that does not evidence indebtedness with a specified interest rate, interest is calculated as provided in subsection (8).
>
> * * *
>
> (8) Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5–year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs. In an action for medical malpractice, interest under this subsection on costs or attorney fees awarded under a statute or court rule is not calculated for any period before the entry of the judgment. The amount of interest attributable to that part of the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney.

Mich. Comp. Laws § 600.6013 (emphasis added).  The purposes of this statute are "(1) to

compensate the prevailing party for the loss of the use of funds awarded as a money judgment and

for the costs of bringing a court action and (2) to provide an incentive for prompt settlement."

*Dawe v. Bar-Levav & Assocs.*, 808 N.W.2d 240, 258 (Mich. Ct. App. 2010).

In addition, under Title VII case law, "[p]rejudgment interest is usually appropriate to make a discrimination plaintiff whole." *Thurman v. Yellow Freight Sys., Inc.* 90 F.3d 1160, 1170 (6th Cir. 1996). It "should be awarded as a part of backpay[.]"  *Id.*  On the other hand, "prejudgment interest should not be awarded if the statutory obligation on which interest is sought is punitive in nature." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 495 (6th Cir. 2013) (quoting *Wickham Contracting Co. v. Local Union No. 3, IBEW, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir. 1992)).

O'Reilly argues that, under § 600.6013(1), prejudgment interest is not allowed under Michigan law for matters filed after October 1, 1986.  To the contrary, that section expressly allows prejudgment interest on damages in a money judgment, but it excludes interest on future damages. Future damages are

> damages arising from personal injury which the trier of fact finds will accrue after the damage findings are made and includes damages for medical treatment, care and custody, loss of earnings, loss of earning capacity, loss of bodily function, and pain and suffering.

Mich. Comp. Laws § 600.6301(a).  Thus, prejudgment interest does not apply to Glowacki's future economic damages (i.e., front pay).  In addition, it does not apply to the punitive damages award under Title VII because prejudgment interest is not appropriate for punitive damages.  *See In re ClassicStar*, 727 F.3d at 495.  However, § 600.6013(1) does not prohibit all prejudgment interest.

Referencing § 600.6013(6), O'Reilly also argues that Mich. Comp. Laws § 600.6013 only permits prejudgment interest on written instruments.  However, that section only applies to complaints filed between January 1, 1987, and July 1, 2002.  Thus, it does not apply here.

O'Reilly also argues that prejudgment interest is not necessary to make Glowacki whole because the jury's award did not account for the wages that Glowacki earned after his termination. That argument is conclusory, undeveloped, and unpersuasive.  An award of prejudgment interest on back pay and other economic and non-economic damages and costs is appropriate here to

25

compensate Glowacki.  However, the Court will not award prejudgment interest on punitive damages or future economic damages.  Prejudgment interest on the former is not appropriate and interest on the latter is not permitted by Mich. Comp. Laws § 600.6013(1).

Accordingly, under Mich. Comp. Laws § 600.6013(1) & (8) the Court will award Glowacki prejudgment interest—accruing from October 7, 2021, up to the date of the Court's judgment on March 15, 2023—on his attorney's fees and costs, on his past economic damages (back pay, lost stock options) and on his non-economic damages (emotional distress).

### B. Post-Judgment Interest

Glowacki seeks post-judgment interest under 28 U.S.C. § 1961, accruing from March 15, 2023.  O'Reilly does not challenge that request.  The Court will grant it.

## VIII. CONCLUSION

For the reasons herein, the Court will grant O'Reilly's motions in part and deny them in part.  The Court will amend the judgment to reduce the punitive damages award to $300,000.  The Court will not reduce the past economic damages of $979,000, the future economic damages of $800,000, or the non-economic damages of $160,000.  O'Reilly is not entitled to a new trial.  The Court will award costs of $8,391.61.  The Court will award attorney's fees in the amount of $140,075.  The Court will grant prejudgment interest under Mich. Comp. Laws § 600.6013(1) & (8) on the attorney's fees, costs, past economic damages (back pay and stock options), and non-economic damages (emotional distress), accruing from October 7, 2021, through March 15, 2023.  The Court will grant post-judgment interest under 29 U.S.C. § 1961, accruing from March 15, 2023, until the judgment is satisfied.

The Court will enter an order and amended judgment consistent with this Opinion.


Dated: December 14, 2023                    /s/ Hala Y. Jarbou
                                            HALA Y. JARBOU
                                            CHIEF UNITED STATES DISTRICT JUDGE